# EXHIBIT A

# Dexia Credit Local v. Rogan

United States District Court for the Northern District of Illinois, Eastern Division

October 9, 2008, Decided; October 9, 2008, Filed

Case No. 02 C 8288

**Reporter**
2008 U.S. Dist. LEXIS 80547 *; 2008 WL 4543013

DEXIA CREDIT LOCAL, Plaintiff, vs. PETER G. ROGAN, et al., Defendants.

**Subsequent History:** Injunction granted at, in part, Injunction denied by, in part Dexia Credit Local v. Rogan, 2008 U.S. Dist. LEXIS 91149 (N.D. Ill., Nov. 10, 2008)

**Prior History:** Dexia Credit Local v. Rogan, 231 F.R.D. 287, 2005 U.S. Dist. LEXIS 23315 (N.D. Ill., 2005)

**Counsel:** [*1] For Dexia Credit Local, Plaintiff: Scott T. Mendeloff, LEAD ATTORNEY, Gabriel Aizenberg, Howrey LLP (CH), Chicago, IL; Former AUSA, United States Attorney's Office (NDIL), Chicago, IL; Abigail Lynn Peluso, Howrey LLP, Chicago, IL.

For Peter G Rogan, Defendant: Howard Michael Pearl, LEAD ATTORNEY, Cornelius Moore Murphy, Monika Maria Blacha, Winston & Strawn LLP, Chicago, IL; Neil E. Holmen, LEAD ATTORNEY, Walker Wilcox Matousek LLP, Chicago, IL; Joseph Andrew Spiegler, Much Shelist Denenberg Ament & Rubenstein, PC, Chicago, IL.

For Braddock Management, L.P., a California Limited Partnership, Brainbridge Management L.P., formerly known as Braddock Management, L.P., Defendants: Phillip Stewart Reed, LEAD ATTORNEY, Debra L Bogo-Ernst, John Michael Touhy, Sean Patrick Dailey, Vincent J. Connelly, Mayer Brown LLP, Chicago, IL.

For Bainbridge Management, Inc., Defendant: Michael J. O'Rourke, LEAD ATTORNEY, O'Rourke & Moody, Chicago, IL; Phillip Stewart Reed, LEAD ATTORNEY, Debra L Bogo-Ernst, Sean Patrick Dailey, Vincent J. Connelly, Mayer Brown LLP, Chicago, IL; Brian Michael Dougherty, Mitchell Bruce Katten, O'Rourke, Katten & Moody, Chicago, IL; Limo T. Cherian, O'Rourke, McCloskey & Moody, [*2] Chicago, IL.

For Janet Pedlow, Intervenor Plaintiff: Myles Patrick ORourke, O'Rourke Katten & Moody, Chicago, IL; Randall Scott Sender, Sender Associates, Chtd., Oak Forest, IL.

For Judith K. Rogan, Brian P. Rogan, Intervenor Defendants: Michael J. O'Rourke, LEAD ATTORNEY, Andrew Neal Levine, Chad W. Riley, Ethan Lasher Crooks, O'Rourke & Moody, Chicago, IL; Myles Patrick ORourke, O'Rourke Katten & Moody, Chicago, IL.

For Robert C Rogan, Sara C Rogan, Intervenor Defendants: Jeffrey J. Halldin, Timothy J. Touhy, Touhy, Touhy, Buehler & Williams, L.L.P., Chicago, IL.

For Janet Pedlow, Intervenor Defendant: Myles Patrick ORourke, O'Rourke Katten & Moody, Chicago, IL.

For United States, Movant: Joseph A. Stewart, United States Attorney's Office (NDIL), Chicago, IL.

For Posada Hoover Creek, LLC, Posada Palmetto, LLC, Hoover Creek Plantation Partners, LLC, Palmetto Common Partners, LLC, Movants: Douglas Alan Albritton, Freeborn & Peters, Chicago, IL.

For Roger E. Mays, Movant: Douglas Alan Albritton, LEAD ATTORNEY, Freeborn & Peters, Chicago, IL.

For Janet Pedlow, Intervenor: Randall Scott Sender, Sender Associates, Chtd., Oak Forest, IL.

For Dexia Credit Local, Counter Defendant: Scott T. Mendeloff, [*3] LEAD ATTORNEY, Gabriel Aizenberg, Howrey LLP (CH), Chicago, IL.

**Judges:** MATTHEW F. KENNELLY, United States District Judge.

**Opinion by:** MATTHEW F. KENNELLY

## Opinion

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Dexia Credit Local holds a judgment against Peter Rogan in an amount in excess of $ 124 million. In August 2008, Dexia filed an *ex parte* motion for a temporary restraining order and a preliminary injunction, seeking an order freezing and turning over various assets in the United States and abroad that it alleges are Rogan's or in his control or that he fraudulently transferred. In that motion, Dexia alleged that Rogan, in concert with his attorney Fred Cuppy and others, had engaged in a longstanding scheme to hinder Dexia and other creditors from executing against his assets. Dexia filed the motion *ex parte* based on its allegations that Rogan had taken steps in the past to hinder Dexia from collecting, including evading court orders, and that if he became aware of the motion, Rogan likely would take further steps to evade its intended effect.

Dexia supported the motion with an extensive and voluminous factual and legal submission. The Court initially heard Dexia's counsel *in camera,* albeit [*4] on the record, and made findings that permitted Dexia to submit its materials *ex parte.* The Court then took Dexia's motion for a temporary restraining order under advisement. On or about September 2, 2008, the Court summoned Dexia's counsel for a further *in camera* court session. During that session, the Court advised Dexia's counsel that it intended to grant the requested temporary restraining orders and asked counsel to prepare and submit the necessary draft orders. Dexia's counsel did so, and the Court signed the orders on September 4-5, 2008.

The temporary restraining orders the Court entered barred Peter Rogan, his wife Judith Rogan, and Cuppy from directly or indirectly making or allowing transfers or other dispositions of various assets. The orders also froze assets held by certain institutions and entities that, based on Dexia's submissions to the Court, appeared to be within Rogan's effective control. These included assets held by certain trusts established for the benefit of Rogan's children, Brian Rogan, Robert Rogan, and Sara Caitlin Rogan, as well as accounts in which funds the trusts had transferred to the children were held. Those accounts included the children's own accounts [*5] at certain banks and brokerage firms.

Rogan's counsel served the temporary restraining orders upon the enjoined individuals and upon the institutions and entities holding the accounts the Court had ordered frozen. Following service of those orders, Brian, Robert, and Sara Rogan each moved to dissolve the orders. Because the orders had been entered *ex parte* in the first place, they were of limited duration. *See* Fed. R. Civ. P. 65(b)(2). As a result, Dexia's motion for a preliminary injunction effectively merged with the requests to dissolve the orders. The Court set the matter down for hearing on the motion for preliminary injunction and directed Dexia to post a $ 50,000 bond, which Dexia promptly did.

**Facts**

An evidentiary hearing is required on a motion for preliminary injunction only to the extent that the response to such a motion identifies genuine issues of material fact. *See In re Aimster Copyright Litig. (Appeal of Deep),* 334 F.3d 643, 653-54 (7th Cir. 2003); *Ty, Inc. v. GMA Accessories, Inc.,* 132 F.3d 1167, 1171 (7th Cir. 1997). "[A]s in any case in which a party seeks an evidentiary hearing, he must be able to persuade the court that the issue is indeed genuine and material and [*6] so a hearing would be productive -- he must show in other words that he has and intends to introduce evidence that if believed will so weaken the moving party's case as to affect the judge's decision on whether to issue an injunction." *Ty,* 132 F.3d at 1171. The Rogan children made written submissions to the Court that raised no dispute about the lion's share of Dexia's factual contentions. Rather, the factual component of their submissions focused on their contentions that they are innocent parties who were unfairly harmed by the temporary restraining order and would be unfairly harmed by a preliminary injunction.

The Court first reviews the facts relevant to the appropriateness of enjoining Peter Rogan. The Rogan children have contested none of those facts. Thus, the Court will review them in summary fashion.

In 1989, an entity that Rogan controlled purchased Edgewater Medical Center, a hospital on Chicago's north side. The Rogan-controlled entity managed and administered EMC, and Rogan served as EMC's chief executive officer.

In 1994, EMC was sold to Northside Operating Company. To finance the purchase, Rogan caused the Illinois Health Facilities Authority to issue approximately $ 41 [*7] million in bonds. Though he had sold EMC, Rogan retained control of the hospital after the sale via a series of transactions, and he then caused EMC to enter into management contacts with two entities that he also controlled, Braddock Management LP and Bainbridge Management, Inc. In 1997, Rogan arranged

to refinance the bond debt at a lower interest rate, and to this end, in June 1988 he secured a letter of credit from Dexia guaranteeing repayment of the bonds. Dexia contends that both during the due diligence process that led to its issuance of the letter of credit, and after Dexia issued the letter of credit, Rogan defrauded Dexia by concealing that a significant portion of EMC's revenue was obtained by fraudulent means, specifically fraud in connection with claims for Medicare and Medicaid payments.

Eventually EMC's fraud was discovered, and the government suspended Medicare and Medicaid payments to EMC. This caused EMC to suffer financial reverses and, eventually, led Dexia to have to pay $ 55 million on EMC's behalf to satisfy obligations to bondholders. Dexia was unable to obtain reimbursement from EMC. It thereafter sued Rogan, Braddock Management, and Bainbridge Management for [*8] fraud, conspiracy, and other torts. In May 2007, Dexia obtained a default judgment against Rogan and the entities for actual damages of approximately $ 53 million, punitive damages of approximately $ 53 million, prejudgment interest of approximately $ 18 million, and costs of approximately $ 11,000.

Dexia then instituted proceedings to attempt to collect its judgment. Both before and after entry of the judgment, Dexia met with stalling, resistance, and outright evasion from Rogan and others connected with him. It ultimately obtained documents and other evidence that led it to file, in mid-August 2008, its motion seeking imposition of temporary restraining orders and preliminary injunctions against various persons and entities.

At issue in the present proceedings are trusts that Rogan established for the benefit of his three children. They include three United States-based trusts established in 1992 and three Belize-based trusts established in 1997. In 1992, Rogan's children were ages 14, 11, and 8, respectively. The trusts were initially funded primarily with ownership interests in Rogan-controlled businesses.

When EMC was sold to Northside Operating Company in 1994, the children's trusts, [*9] which held stock in a Rogan-controlled entity that owned the hospital, received a total of approximately $ 4 million from the sale proceeds of $ 31 million. The trusts also owned entities that, in turn, owned the management companies through which Rogan continued to operate EMC following its sale. During the period when Rogan operated EMC via these entities -- 1994 through 1997 -- the children's trusts received millions of dollars in distributions from the entities.

In 2002, the federal government instituted litigation against Rogan under the federal False Claims Act concerning the alleged submission of false Medicare and Medicaid claims for patients referred to EMC. In that case, Judge John Darrah found that in the early 1990's, Rogan entered into a conspiracy with another EMC officer and two physicians to pay the physicians kickbacks and other improper benefits in return for patient referrals. These referrals, in turn, resulted in substantial profits for Rogan. *See United States v. Rogan,* 459 F. Supp. 2d 692, 700 (N.D. Ill. 2006). Though the government's lawsuit directly concerned particular false claims submitted from 1995 through 2000, Judge Darrah found that "[t]he conspiracy was [*10] evident in the early 1990s." *Id.* Based upon other findings by Judge Darrah, it appears that he concluded the conspiracy began (albeit on an apparently smaller scale) at least as early as 1993, *see id.* (findings concerning dealings between Roger Ehmen and a Dr. Barnabas) -- in other words, before the 1994 sale of EMC to Northside Operating Company that generated proceeds paid to the children's trusts. Judge Darrah found that the government proved that from 1995 through 2000, Rogan caused Edgewater to submit over $ 19 million in false claims to Medicare and Medicaid. *Id.* at 727. As indicated earlier, during at least part of that period, the Rogan children's trusts received significant distributions from the entities managing the hospital's operations, whose operations were in turn controlled by Peter Rogan.

Based upon these facts, which the Rogan children do not contest, the children's trusts have been funded, in significant part, with assets that fairly may be considered to be the proceeds of fraud. On the other hand, Dexia does not appear to contend, and it has not shown at this juncture, that *all* of those funds were the proceeds of fraud.

In its submission in support of its motion for [*11] temporary restraining order and preliminary injunction, Dexia offered evidence tending to show that following the establishment and funding of the children's trusts, Rogan continued to exercise control over the trusts and the assets they held. In the current proceedings, the children have not challenged Dexia's contention in that regard. For this reason, the Court, again, reviews this evidence in summary fashion.

First, Rogan's personal attorney, Fred Cuppy, played a direct role in administering the children's trusts. In 1999, Cuppy, in his role as trustee, received on the trusts' behalf a distribution of a little over $ 1.2 million from Braddock Management LP; immediately caused the trusts to "loan" $ 1.35 million to Boulevard Management, Ltd.; and Boulevard, via the assistance of Troy Myers (another Peter Rogan attorney), in turn transferred $ 1.2 million to Rogan himself. This sum was transferred ostensibly to pay off a promissory note, though no documents evidencing the note have surfaced. *See* Dexia Ex. 349 P 46 & attached Ex. KK. The Court reasonably may infer, and does infer, that Rogan and Cuppy used the children's trusts on this occasion to facilitate a significant payment to [*12] Rogan via a circuitous route which, the Court infers, was employed to try conceal payment to Rogan of what amounted to a very large cash distribution from entities in which he had no significant ownership interest of record.

Dexia's evidence also reflects that Rogan controlled and controls certain investments that appeared on the surface to be owned by the children's trusts. These include various real estate developments in Savannah, Georgia. Dexia's evidence also reflects that Cuppy caused the children's trusts and a Bahamian trust established by Rogan to invest in the same Rogan-related enterprises. Indeed, in 2002, Cuppy caused an entity that was, on paper, owned entirely by the children's Belize-based trusts to transfer nearly $ 1 million to an entity from which Rogan and Cuppy drew money for Rogan's benefit. Finally, Dexia has offered evidence tending to show that David Miller, an employee of Rogan, administered transactions pertaining to assets that, on their surface, were owned entirely by the children's trusts.

Robert and Sara Rogan submitted signed but unsworn statements in support of their motion to dissolve the temporary restraining order and, in effect, in opposition to Dexia's [*13] motion to convert that order to a preliminary injunction. Because the statements are unsworn, they are of no real benefit to the Rogan children. But even an unsworn statement may be used by an opposing party, *see* Fed. R. Evid. 801(d), and the statements are beneficial to Dexia in certain respects. Specifically, certain of the statements confirm that the Rogan children have received significant distributions from the trusts. Sara Rogan stated that she has "received periodic distributions" from a trust, the last a $ 25,000 distribution in July 2008; Brian Rogan made a similar statement (which he later repeated in a sworn affidavit). Robert Rogan says nothing in his unsworn statement about his receipt of funds from the trusts. It appears from Dexia's submissions and from the arguments of counsel for the children that each of the children has at least one bank account as well as a securities account.

In later-submitted sworn affidavits, which Dexia has not sought to dispute and which the Court appropriately may consider, Brian Rogan recounts his employment history. After graduating from college in 1983, he went to work for ABF Freight Systems in its management training program, worked there [*14] for a little over two years, and received a salary, which he deposited into a personal account at Chase Bank. He left ABF to go to work for Hoover Creek Plantation in a management role, receiving a salary of $ 60,000, which he deposited into a personal account at Wachovia Bank on which his mother Judith Rogan is also, it appears, a signatory. He opened an account at Bank of America in Chicago in August 2008 when he resumed his education.

Brian states in a sworn affidavit that he has received distributions from a trust established in his name -- in amounts he does not disclose beyond the reference to $ 25,000 mentioned above -- and that he has invested that money "in part" in a securities account at TD Ameritrade. He used funds "given to me from my trust" to pay for his wedding in September 2007. He states that he has not transferred any funds to Peter Rogan.

Dexia has also submitted its own evidence regarding benefits the Rogan children have received from the trust, the accuracy of which the children do not contest. A trust of which Robert Rogan is the beneficiary purchased and owns the residence into which he moved in 2003; Cuppy was Robert's primary contact in facilitating the acquisition. [*15] Robert has also received from one or both of the trusts established for his benefit living expenses and funds for the purchase of a car.

Dexia has also submitted evidence reflecting that between 2004 and 2006, Judith Rogan transferred over $ 548,000 to her daughter Sara or for Sara's benefit. Dexia contends, with supporting evidence, that Peter Rogan has been the sole source of all funds to which Judith has had access. The Rogan children do not contest Dexia's contention. They likewise have not contested Dexia's contention that Judith has acted as Peter Rogan's alter ego, a contention amply supported by evidence Dexia has submitted to the Court. As a result, it has been established, at least for purposes of the present motion, that the $ 548,000-plus that Sarah

has received or benefitted from was transferred, in effect, by Peter Rogan (via Judith Rogan as his alter ego).

Aside from the brief references in the Rogan children's statements and the evidence regarding Robert Rogan cited above, Dexia has offered no evidence -- at least none the Court can locate in the voluminous submissions -- regarding exactly when the Rogan children received transfers from the trusts. That is, however, unsurprising; [*16] Dexia did not have ready access to records regarding deposits and withdrawals from the children's accounts, and the Court was advised during the hearings on the present motion that, with the exception of Brian Rogan, the Rogan children had not produced any meaningful quantity of records regarding those accounts. That aside, however, the evidence submitted is sufficient, at least for purposes of a preliminary injunction motion, to permit a reference that the transfers from the trusts to the children, and from Judith Rogan to Sara, occurred in or after 1997, when the Dexia debt was incurred, and that a significant portion of those transfers occurred after Dexia filed this lawsuit.

**Discussion**

**1. Preliminary issues**

The Rogan children challenge the Court's entry of the temporary restraining orders without notice. The Court has previously explained the basis for its determination to enter the orders *ex parte* and continues to believe that determination was correct. In any event, however, the Rogan children have been heard fully on the issue of the restraining orders' extension and on the motion for preliminary injunction. Their challenge to the *ex parte* nature of the restraining orders is now [*17] effectively moot.

The Court also rejects the Rogan children's challenge to the initial entry of the temporary restraining orders without requiring Dexia to post a bond. The Court subsequently ordered Dexia to post a bond, and Dexia promptly complied. This challenge is thus likewise moot.

Brian Rogan contends it is inappropriate for the Court to enter an injunction against him because he is not a party to the underlying suit. The Court notes initially that it did not enjoin the Rogan children personally, nor has Dexia asked the Court to do so. Rather, the Court was asked to preclude financial institutions from transferring certain assets on the ground that they are, in fact or in effect, Peter Rogan's assets. The requested orders unquestionably affect the interests of the Rogan children, but the fact is that they themselves have not been enjoined personally.

In any event, Illinois' statutory provisions relating to post-judgment collection proceedings, which apply in federal court pursuant to Federal Rule of Civil Procedure 69(a), specifically permit a court to "enjoin any person, whether or not a party to the supplementary proceedings, from making or allowing any transfer or other disposition [*18] of, or interference with, the property of the judgment debtor not exempt from the enforcement of a judgment." 735 ILCS 5/2-1402(f)(2). Illinois Supreme Court Rule 277(a), which governs citation proceedings, likewise permits a proceeding to be "against the judgment debtor or any third party the judgment creditor believes has property of or is indebted to the judgment debtor." That is the primary basis upon which Dexia has proceeded in this matter -- its contention that third parties hold property that actually is Peter Rogan's, even though it is held under some other guise.

The Rogan children also challenge the propriety of venue in this District. Again, it is important to note that they are not personally the object of any restraining order or of the requested preliminary injunction. Rather, the Court has entered orders directed at persons and institutions holding assets reasonably believed to be those of Peter Rogan, who has a judgment against him that was entered in this District. In any event, as Dexia argues, the Rogan children likely have waived any objection to venue by intervening in this proceeding. *See, e.g., Asbury Glen/Summit Ltd. P'ship v. Southeast Mortgage Co.,* 776 F. Supp. 1093, 1096 (W.D.N.C. 1991); [*19] *Commonwealth Edison Co. v. Train,* 71 F.R.D. 391, 394 (N.D. Ill. 1976). Even were that not the case, venue is proper here. Ths current proceedings are supplementary, post-judgment collection proceedings that arise from the Court's entry of a judgment against Rogan. The events that gave rise to the "cause of action" -- namely Dexia's collection efforts -- took place in this District. So even if venue must be determined separately for post-judgment proceedings, it has been established.

**2. Merits of Dexia's motion**

The Court turns next to the merits of Dexia's motion for a preliminary injunction. To prevail on its motion, Dexia must show that it has a likelihood of success on the merits and that it lacks an adequate remedy at law and will suffer irreparable harm if the injunction is not

granted. *FoodComm Int'l v. Barry,* 328 F.3d 300, 303 (7th Cir. 2003). If Dexia meets these requirements, the Court must balance the harm to Dexia if an injunction is not issued against the harm to opposing parties if it is issued, and must also consider the interests of others, including the public. *Id.* This balancing "involves a sliding scale analysis: the greater [the movant's] chances of success on the merits, [*20] the less strong a showing it must make that the balance of harm is in its favor." *Id.*

The Rogan children did not challenge Dexia's motion to enter preliminary injunctions against the domestic and foreign trusts of which the children are the beneficiaries and have thus forfeited any challenge to those orders. In any event, the Court properly entered preliminary injunctions against the children's trusts based on Dexia's contention, not challenged by the children and on which Dexia has established a reasonable likelihood of success, that the trusts are alter egos of Peter Rogan.

To pierce the veil of the trusts, Dexia must show that they and Rogan have such a unity of interest that their separate personalities no longer exist, and that there are circumstances such that continuing to recognize their separateness would sanction a fraud or promote injustice. *See, e.g., Van Dorn Co. v. Future Chem. & Oil Corp.,* 753 F.2d 565, 569-70 (7th Cir. 1985). A trust may be considered to be the alter ego of a judgment debtor if the debtor used the trust's assets for his own benefit and exercised authority over the trust's assets. *See, e.g., In re Turner,* 335 B.R. 140, 147 (Bankr. N.D. Cal. 2005), *reaff'd* [*21] *on reconsideration,* 345 B.R. 674 (Bankr. N.D. Cal. 2006). The factors considered include whether there was a close personal relationship between the transferor and the trust; the transferor received consideration for the transfer; the trust was created to shield the transferor's assets from creditors and the transfer was made in anticipation of incurring debts or in anticipation of collection activity; the transferor continued to enjoy the benefits of the property following transfer; the transferor contributed all or just part of the trust's assets; and there was commingling of management and record keeping of the assets of the transferor and the trust. *See, e.g., United States v. Schaut,* No. 97 C 4114, 2001 U.S. Dist. LEXIS 21549, 2001 WL 1665314, at *3 (N.D. Ill. Dec. 28, 2001); *In re Maghazeh,* 310 B.R. 5, 18-19 (Bankr. E.D.N.Y. 2004); *Turner,* 335 B.R. at 147.

Even had the Rogan children contested Dexia's request for preliminary injunctions against the trusts, the Court would have concluded that Dexia established a reasonable likelihood of success on the merits on its claim that the trusts are Peter Rogan's alter egos. There is no question that a close relationship exists between the transferor (Rogan) and the [*22] trusts (whose beneficiaries are Rogan's children) and that Rogan contributed all of the assets that the trusts hold without receiving any consideration in return. In addition, administration of the trusts was under the control of Cuppy, Rogan's personal attorney. The evidence Dexia presented reflects that Cuppy was wearing at least two hats and that he acted in concert with Peter Rogan and with Rogan's interests in mind as much as, and perhaps more so than, the interests of the trust beneficiaries. And in at least some significant instances, recounted earlier, the trusts' assets were used for the benefit of Rogan himself, without regard to the interests of the trust beneficiaries. To that extent, at least, trusts amounted to a facade that effectively allowed Rogan to direct the disposition of their assets as though he had never parted with them to begin with.

Based on the current record, there is some question whether the children's trusts (in possible contrast to certain other trusts Rogan established) were set up in anticipation of Rogan incurring any particular debt or in anticipation of any particular collection activity. But there is evidence, not disputed by the Rogan children, [*23] that Cuppy marketed himself as being in the business of setting up asset protection devices, including offshore trusts, for persons like Peter Rogan with substantial wealth. It is fair to infer that Rogan established the children's trusts for that purpose, even if not to try to evade any *particular* debt or creditor.

In sum, Dexia provided ample evidence -- none of it contested by the Rogan children -- establishing a reasonable likelihood of success on its contention that the children's trusts were Peter Rogan's alter egos. [1] For this reason (in light of the other preliminary injunction factors discussed below), it was and is appropriate to freeze the assets of the trusts.

That by itself does not, however, entitle Dexia to freeze accounts into which funds that the trusts (or Judith Rogan) have distributed to the children have been deposited. The effect of the alter ego finding is a determination that the trusts' assets and those of Judith Rogan were, in effect, still Peter Rogan's own assets.

---

[1] The same is true with regard to Judith Rogan, as noted above; the children, and in particular Sara Rogan, have not challenged Dexia's contention in that regard.

But that does not definitively determine [*24] whether Dexia has shown a reasonable likelihood of success on its contention that the funds Rogan's alter egos transferred to the children are assets that Dexia is entitled to recover -- or, at present, to hold in place pending its attempt to recover them.

The Court does not understand Dexia to contend that the Rogan children themselves have acted as Peter Rogan's alter egos -- and even if Dexia could be understood as making such a contention, it not established a reasonable likelihood of success on that particular point. There is no indication in the current record that any of the Rogan children were anything other than innocent beneficiaries of their father's largesse. Peter Rogan may have gained via fraud the lion's share of the assets he transferred to the trusts, but there is no indication that the children participated in the fraud or knew of its existence. Nor is there any evidence that any of them -- in contrast to, for example, their mother Judith Rogan -- were involved in any effort to funnel assets back to Peter Rogan or to permit the assets in the trusts to be used for his benefit. To put it another way, although Rogan, via the instrumentality of the trusts, conferred significant [*25] assets on his children without receiving consideration in return, there is no evidence that Rogan retained control over those assets after they were transferred to the children.

Dexia contends that it can levy on the assets that the Rogan children have received from the trusts via a theory that the children are Peter Rogan's nominees. A judgment creditor may levy upon property held in the name of someone other than the judgment debtor if the debtor engaged in a legal fiction by placing title to the property in the hands of someone else while, in actuality, retaining all or some of the benefits of ownership. *See, e.g., Richards v. United States,* 231 B.R. 571, 578 (E.D. Pa. 1999). In determining whether a person -- in this case, each of Rogan's children -- is a nominee for a debtor, courts consider factors such as whether the person paid consideration for the property, whether the property was given to the person in anticipation of a suit or liability, whether the judgment debtor exercises control of the property after its transfer, whether there is a family or other close relationship between the debtor and the transferee, whether the debtor has the benefits of the property after the [*26] transfer, and whether the debtor maintains the property after the transfer. *See, e.g,. Richards,* 231 B.R. at 579, *see also, United States v. Reed,* 168 F. Supp. 2d 1266 (D. Utah 2001). *See generally* Dexia Mem. Relating to Peter G. Rogan Irrevocable Trust at 24 n.49 (citing cases), *cited in* Dexia Resp. to Opp. of Brian Rogan, et al. to Mot. for Prelim. Injunction at 5 n.5.

In this case, certain of these factors cut in favor of a "nominee" finding, and others cut in the opposite direction. The Rogan children paid neither Peter Rogan nor the trusts or Judith Rogan any consideration, and there is obviously a family relationship between the children and their father. In addition, it appears that the children received significant distributions after it had become apparent that Rogan had potential or even actual liabilities to Dexia. And as discussed earlier, Dexia has offered evidence giving rise to a reasonable inference that the entire purpose of the children's trusts was to allow Rogan to continue, irrespective of his obligations to creditors, to funnel to his children unlimited sums of money, a good deal of it obtained by fraud. On the other hand, there is no indication that Peter Rogan [*27] maintained any degree of control over the children's funds after they received distributions from the trusts (or Judith Rogan) or that he obtained any benefit from the funds they received.

In the Court's view, the most significant factor in the analysis of Dexia's nominee theory concerns the transferor's access to or control over the assets following their transfer: as noted earlier, the thrust of the nominee doctrine concerns the debtor's placement of paper title in the hands of someone else while actually retaining some or all of the benefits of ownership. Though Dexia has shown, sufficiently for present purposes, that Peter Rogan retained the benefits of ownership regarding assets held in the children's trusts, it has not shown that he had any of the benefits of ownership over assets that the trusts (or Judith Rogan) had transferred to the children. For this reason, the Court concludes that Dexia has not shown, on the present record, a reasonable likelihood of success on its contention that the children themselves hold assets as Peter Rogan's nominee.

Dexia also appears to contend that Peter Rogan's transfers (via his alter egos) of assets to the children amounted to fraudulent conveyances [*28] that may be unwound under Illinois law. A fraudulent transfer by an alter ego entity properly may be treated as a fraudulent transfer by the judgment debtor. *See In re Turner,* 335 B.R. at 147 (citing *Fleet Credit Corp. v. TML Bus Sales, Inc.,* 65 F.3d 119, 121-22 (9th Cir. 1995)). The focus is on the intent of the transferor, not that of the transferee.

Dexia has established a reasonable likelihood of success on its contention that most, if not all, of the

transfers made by Peter Rogan's alter egos to the children amount to fraudulent conveyances under Illinois law. Contrary to the suggestion of the children, it appears that a judgment creditor may assert a fraudulent conveyance claim in the context of post-judgment collection proceedings and need not file a separate lawsuit; that is how it was done in *Hong Kong Electro-Chemical Works, Ltd. v. Less,* 539 F.3d 795 (7th Cir. 2008).

Under Illinois law, a debtor's transfer of an asset before or after a creditor's claim arose is fraudulent if the transfer was made "with actual intent to hinder, delay, or defraud any creditor of the debtor." 740 ILCS 160/5(a). In determining whether "actual intent" exists, a court is to consider whether:

- the [*29] transfer was to an insider;
- the debtor retained possession of control of the property after transfer;
- the debtor had been sued or threatened with suit before the transfer;
- the transfer was of substantially all the debtor's assets;
- the debtor absconded;
- the debtor removed or concealed assets;
- the debtor received consideration reasonably equivalent to the value of the asset transferred;
- the debtor was insolvent or became insolvent shortly after the transfer;
- the transfer was made shortly before or after a substantial debt was incurred;
- the debtor transferred the essential assets of a business to a lienor who transferred the assets to an insider of the debtor.

740 ILCS 160/5(b).

In this case, though Peter Rogan did not retain control over the assets after they were transferred to his children, the transfers were made to "insiders" (immediate family members); at least some of them were concealed via the circuitous routing of transfers via offshore trusts; at least some of the transfers were made after Dexia filed or threatened suit; Rogan left the country for Canada; Dexia has shown that he concealed significant assets via other trusts and similar devices; he became insolvent in [*30] the sense of not having assets sufficient to satisfy his obligations; and he received no consideration for the transfers. Whether or not these particular transfers constituted all or substantially all of his assets, the evidence is sufficient to show a reasonable likelihood of success on Dexia's contention that at least some the transfers to the children amounted to fraudulent conveyances. This leads to a conclusion that some significant portion of the assets contained in the children's personal bank and securities accounts -- precisely how much is less than crystal clear -- are there as a result of fraudulent conveyances.

The Rogan children argue that they should not be penalized because their father chose to provide for them. There is, of course, nothing wrong with providing for one's children. But that does not mean that a debtor is entitled to dispose of his assets (via alter egos, as Rogan did) as he wishes -- even to support his children -- while evading his obligations to creditors.

The Rogan children also argue that they are entirely innocent of the fraud that Rogan was found, via the default judgment, to have perpetrated upon Dexia. They contend, to paraphrase one of their lawyers, [*31] that the sins of the father should not be visited upon his children. The Court certainly ascribes to this as a matter of principle. That said, the law permits transfers by a debtor to family members to be undone under appropriate circumstances. On the other hand, the Rogan children's innocence vis-avis the underlying fraud factors into the Court's consideration of the balance of harms, a matter the Court will take up shortly.

Finally, on the issue of likelihood of success, the Court briefly addresses the issue of constructive trust. "The doctrine of constructive trust is an equitable remedy based on fairness. A court may impose a constructive trust on property acquired through fraud or theft, with the victim as beneficiary . . . ." *Hong Kong Electro-Chemical Works, Ltd. v. Less,* 539 F.3d 795, 800 (7th Cir. 2008). Dexia [*32] has established a reasonable likelihood of success on its contention that at least some portion of the assets held in the children's trusts, and thus some portion of the assets transferred to them, was obtained by fraud and thus is subject to imposition of a constructive trust. That is a further basis upon which Dexia may seek to levy on the funds transferred to the children.

The Court next turns to the other factors in the preliminary injunction analysis. Dexia has established that, absent a preliminary injunction, it risks irreparable injury for which it lacks an adequate remedy at law. Dexia holds a substantial judgment against Rogan but has been unable to collect. Given the dilatory and obstructive tactics that Rogan and others acting in concert with him have used to hinder Dexia's collection efforts (which Dexia has convincingly shown and which the Rogan children do not address, let alone dispute), it

is likely that, given the opportunity, Rogan will take steps to make the trust assets similarly unavailable. A significant risk of transfer beyond the court's jurisdiction of the assets of a judgment debtor that might be used to satisfy the judgment against him qualifies as irreparable [*33] injury. *See, e.g., Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.,* 805 F.2d 351, 355 (10th Cir. 1986); *In re Feit & Drexler, Inc.,* 760 F.2d 406, 416 (2d Cir. 1985); *cf. SEC v. Lauer,* 52 F.3d 667, 671 (7th Cir. 1995) (potential for dissipation of assets belonging to another amounts to irreparable injury). [2] And once the assets are dissipated or removed from the jurisdiction of the Court -- of which there is a significant risk -- Dexia would lack any reasonably adequate means to levy on those assets. This is sufficient to establish the lack of an adequate legal remedy.

Dexia likewise faces a risk of irreparable injury for which it lacks an adequate legal remedy from the dissipation of the funds the children have obtained via fraudulent conveyances or which they hold in constructive trust for Dexia as the creditor of Peter Rogan. By all indications, in particular the arguments made by their attorneys, the children do not have significant assets beyond those that Dexia has asked the Court to freeze. Allowing the children unfettered access to those assets thus necessarily will lead to their dissipation.

Though Dexia risks irreparable harm absent a preliminary injunction, the children, who as far as the Court can determine are innocent beneficiaries of Peter Rogan, unquestionably will be harmed by entry of the requested injunction. The bottom line is that if [*35] the requested injunction is issued as Dexia request, they will lack access to funds that otherwise would be available to them for the expenses of daily living, not to mention legal fees they may have reasonably incurred in attempting to seek relief from the Court's prior orders. But because a preliminary injunction is an equitable remedy, the Court does not see this as an "all or nothing" proposition. By allowing the Rogan children access to the funds in their bank accounts -- which are minimal to begin with -- and to some portion of the funds in their securities accounts, subject to the Court's oversight, the Court can mitigate the harm they would suffer from a preliminary injunction without depriving Dexia of a nearly-full measure of the remedy it seeks.

Having considered and balanced the appropriate factors, the Court grants Dexia's motion for a preliminary injunction [3] against the accounts at issue in which, it appears from the evidence, the Rogan children hold funds transferred from their trusts or from Judith Rogan, with the following exceptions and conditions. First, the amounts currently in any checking or savings accounts held at banks that are currently the subject of the [*36] temporary restraining orders will be unfrozen, and the Rogan children may use those funds to pay reasonable and necessary expenses. Second, counsel for Dexia and the Rogans are directed to meet and to promptly (i.e. within the next three business days) come up with a mechanism that will permit each of the children to obtain, if he or she wishes, $ 25,000 (net of anticipated capital gains and other taxes as well as commissions) from his or her securities account that is currently the subject of the temporary restraining orders. The children may open new bank accounts in which they may deposit these funds and any others that the Court may hereafter permit them to access from the securities accounts; they will be required to disclose those accounts to Dexia and execute consents permitting Dexia's counsel to obtain records from any such accounts. The funds thus withdrawn may be used for ordinary and necessary expenses of the account holder. The Court is allowing the Rogan children to use these funds -- both those from their regular checking accounts and the $ 25,000 from their securities accounts -- upon the express condition that the funds cannot be transferred directly or indirectly [*37] to or for the benefit of Peter Rogan, Judith Rogan, Fred Cuppy, or anyone working for or acting in concert with any of them. The children are directed to report to the Court

---

[2] In *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 119 S. Ct. 1961, 144 L. Ed. 2d 319 (1999), the Supreme Court held that prior to entry of a money judgment, a district court lacks the authority to issue a preliminary injunction to prevent a defendant from transferring assets in which no lien or equitable interest is claimed. That decision has no bearing on this case, for at least two reasons: Dexia already has a judgment against Rogan, and its citation to discover assets issued to Rogan gave it a lien on his assets. *See, e.g., Pontikes v. Perazic,* 295 Ill. App. 3d 478, 484, 692 N.E.2d 712, 717, 229 Ill. Dec. 723 (1998). [*34] Furthermore, as discussed earlier, Illinois' post-judgment procedure specifically permits a court to enjoin transfer or disposition of property of the judgment debtor -- and, as the Court has concluded, Dexia has established a reasonable likelihood of success on its claim that the assets the children's trusts hold and those the trusts transferred to the children are in effect Peter Rogan's property.

[3] This may, in effect, require modification of previously-entered orders rather than entry of an entirely new order. The Court will leave the mechanics of this to counsel in the first instance.

and to Dexia's counsel with specificity, in documents to be filed under seal, how any of these funds have been expended or transferred, by the close of business on the Friday of each week so long as they still retain any amount of these funds. The Court wishes to make it clear that it will not tolerate any variance from or noncompliance with these directives and will not hesitate to impose severe sanctions, including a contempt finding, upon a showing of such noncompliance. The Court expects counsel to cooperate in drafting and proposing the order or orders necessary to carry out the Court's rulings.

Because the Court has relaxed the terms of the restraining orders, it believes that the bond currently posted by Dexia with regard to the Rogan children and Judith Rogan is adequate and need not be increased or otherwise modified.

The [*38] Court will entertain an appropriate request for expedited discovery, to the extent that has not already been directed by prior orders in this case, to facilitate prompt disposition of Dexia's claims to any funds in the Rogan children's accounts that will remain frozen. These matters will be set for trial or any other necessary evidentiary hearing at a prompt date to be set at the upcoming status hearing. The Court will also entertain requests by the Rogan children for further withdrawals from their securities accounts but will do so only upon submissions verified under oath, and subject to inquiry by the Court and Dexia's counsel, demonstrating good cause for the nature and amount of any expenditures they propose to make.

**Conclusion**

The Court grants Dexia's motion for a preliminary injunction, extending to the accounts held by Brian Rogan, Robert Rogan, and Sara Caitlin Rogan, on the terms and conditions stated in the body of this decision. The case is set for a status hearing on October 16, 2008 at 9:30 a.m. Proposed draft orders are to be submitted to the Court, in hard copy, by no later than 12:00 p.m. on October 15, 2008.

Date: October 9, 2008

/s/ Matthew F. Kennelly

MATTHEW F. KENNELLY

United [*39] States District Judge

**End of Document**