**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **PNC BANK, NATIONAL ASSOCIATION, successor to National City Bank,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **V.** | ) | **Case No. 16 C 5400** |
| | ) | |
| **GLENN UDELL, et al.,** | ) ) | |
| **Defendants.** | ) ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

PNC Bank, N.A., successor to National City Bank, has sued Glenn Udell, Pamela Udell, Sorrento Management, Inc., Chicago Title and Trust, and Sorrento Enterprises, LLC, as well as entities called Sorrento Enterprises, LLC Series A through R,[1] to set aside what PNC contends are fraudulent transfers of assets by the Udells to avoid paying a judgment against Glenn Udell in a state foreclosure action. The defendants have moved for summary judgment on counts 1 through 4 of PNC's complaint. The defendants have also moved to dismiss counts 5through 7 of PNC's amended complaint. For the following reasons, the Court denies defendants' motions, except as to Count 2, on which the Court grants summary judgment for defendants.

**Background**

The Court takes the following facts from the exhibits and statements filed in

---

[1] There are twenty-two defendants in this case. For the sake of readability, the Court will refer to 1) the defendants collectively as "defendants"; 2) Glenn Udell as "Glenn"; 3) Pamela Udell as "Pamela"; 4) Sorrento Enterprises, LLC by its own name; 5) Sorrento Enterprises Series A through R as "the Sorrento Series"; and 6) all of the Sorrento entities collectively as "Sorrento Enterprises and its Series."

connection with defendants' motion for summary judgment.

**1.     Assets**

This case concerns a number of assets belonging to Glenn and Pamela:  1) a series of partnerships and corporations—5331 S Cicero, LLC; GLU, LLC; MSP, LLC; PVPFO, LLC; New Trier Real Estate Partners, LP; Max and Benny's, LLC; Minooka Land Investment, LLP; Security National Warranty, LLC; Hazel Ravine Partners, LLC; Skokie Curragh, LLC; Kaufman & Udell Investments; and 2015 W Irving, LLC (collectively, "Udell Entities"); 2) real estate at 2-4 Cedar Rail Trail, Galena, Illinois ("Galena Property"); 3) five whole life insurance policies issued by New York Life in the amounts of $200,000, $100,000, $100,000, $500,000, and $500,000, respectively; and 4) Glenn's salary from the law firm of Brown, Udell, Pomerantz, and Delrahim, Ltd. for his work as an attorney.

**2.     PNC loan and the formation of Sorrento Enterprises and its Series**

On July 6, 2007, PNC made a loan to in the principal amount of $4,185,000 to 9362 Joint Venture, LLC, secured by a mortgage on certain real estate.  Glenn was the manager of GLU, LLC, which in turn was the manager of 9362 Joint Venture, LLC. Glenn personally guaranteed repayment of PNC's loan to 9362 Joint Venture, LLC.

On April 18, 2008, Glenn and Pamela formed Sorrento Enterprises and its Series.  From that point forward, Glenn's salary from his law firm was deposited directly into bank accounts held by one of the Sorrento Series entities.  On March 1, 2009, Glenn transferred ownership of five whole life insurance policies issued by New York Life to Sorrento Enterprises and its Series.  In May 2009, Glenn transferred his interest in the Udell Entities to Sorrento Enterprises and its Series.  And, on July 9, 2009, Glenn

and Pamela quitclaimed their interest in the Galena Property to a land trust and named Sorrento Enterprises, LLC as the trust's sole beneficiary.

### 3. Foreclosure action

In December 2008, 9362 Joint Venture, LLC failed to pay monthly interest on its note and failed to pay property taxes. On April 23, 2009, PNC sent a notice of default and acceleration to 9362 Joint Venture, LLC. On May 21, 2009, PNC filed a mortgage foreclosure action in the Circuit Court of Cook County against 9362 Joint Venture, LLC and Glenn.

On April 21, 2011, during the foreclosure proceedings and in an effort to reach a settlement, Glenn provided to PNC a current personal financial statement (PFS) and a copy of his 2009 tax return (collectively, "April 2011 Disclosures"). Glenn and Pamela's 2009 joint tax return reported $350,000 in wages. The return also reported that Pamela was self-employed in 2009 and that she netted earnings in the amount of $8,740. Thus the $350,000 figure represented, largely or entirely, the wages Glenn earned as a partner at his law firm.

Glenn's PFS and tax return contained several references to Sorrento Enterprises, LLC. For example, the PFS reported that Glenn had one whole life insurance policy in the amount of $900,000, as well as three term life insurance policies in the amounts of $2,900,000, $2,000,000, and $2,000,000; Sorrento Enterprises, LLC owned the life insurance policies; and Glenn had a tenancy by the entirety interest in Sorrento Enterprises, LLC—fifty percent ownership with a market value of $1.2 million. The following statement also appeared on Glenn's PFS: "[a]ll interest in the assets listed in this statement are owned by Glenn L. Udell as a co-member in Sorrento Enterprises,

LLC, a Delaware limited liability company."  Dkt. no. 15 at 6.  The tax return reported several instances of pass-through income from corporations and partnerships, including, Brown, Udell, Pomerantz, and Delrahim, Ltd.; "Skokie Curragh, LLC – Sorrento Enterprises"; Sorrento Enterprises; and "Security National Warranty, LLC – Sorrento Enterprises."  *Id.* at 24, 28, 33.  The return also reported that pass-through income from GLU, LLC and Minooka Land Investments LLP was transferred to "Sorrento Enterprises" for activities involving rental real estate.  *Id.* at 25, 27.  Similarly, the return reported that Sorrento Enterprises, LLC's pass-through income involved rental real estate activities.  *Id.* at 30-31.  Finally, the return's schedule E form reported that Glenn and Pamela received income or losses from many entities, including "Security National Warranty, LLC – Sorrento Enterprises," "Skokie Curragh, LLC – Sorrento Enterprises," and three other line items bearing the name Sorrento Enterprises LLC.

On May 28, 2013, June 3, 2013, November 12, 2013, and November 14, 2013, PNC requested additional tax returns and personal financial statements from Glenn. Glenn did not provide PNC with these documents.  Ultimately, Glenn and PNC could not reach a settlement.

On October 31, 2014, the Circuit Court of Cook County entered a judgment in favor of PNC and against Glenn in the amount of $5,272,886.87.

**4.**     **State supplementary proceedings**

On November 21, 2014, PNC served Glenn with a citation to discover assets. On August 18, 2015, PNC served a third-party citation to discover assets on Sorrento Enterprises, LLC.

On September 15, 2015, Glenn disclosed the assignments of his interests to particular entities in the Sorrento Series. Specifically, Glenn disclosed that 1) he transferred his interest in the New York Life policies to Sorrento Enterprises – Series P; 2) he and Pamela transferred their interest in the Galena Property to Sorrento Enterprises – Series O; 3) he transferred his interest in the Udell Entities to Sorrento Enterprises Series A through L and N[2]; and 4) he and Pamela transferred their personal property to Sorrento Enterprises, LLC – Series R. *Id.* at 46. Glenn did not disclose the entity in which he was depositing his wages.

## 5. Federal court proceedings

On May 19, 2016, PNC filed this action. In its original complaint, PNC asserted that 1) Glenn and Pamela made fraudulent transfers to Sorrento Enterprises and its Series in violation of the Illinois Uniform Fraudulent Transfers Act (UFTA), 740 ILCS 160; 2) Pamela aided and abetted Glenn in making the alleged fraudulent transfers to Sorrento Enterprises and its Series; and 3) Glenn and Pamela conspired to defraud PNC by transferring assets to Sorrento Enterprises and its Series. PNC also sought to pierce the corporate veil of Sorrento Enterprises and its Series.

On July 21, 2016, defendants filed a motion to dismiss or, in the alternative, stay

---

[2] Specifically, Glenn transferred his interest in 1) 5331 S. Cicero, LLC to Sorrento Enterprises, LLC – Series A; 2) 5301 Cicero, LLC to Sorrento Enterprises, LLC – Series B; 3) GLU, LLC to Sorrento Enterprises, LLC – Series C; 4) MSP, LLC to Sorrento Enterprises, LLC – Series D; 5) PVPFO, LP to Sorrento Enterprises, LLC – Series E; 6) New Trier Real Estate Partners, LLP to Sorrento Enterprises, LLC – Series F; 7) Max and Benny's, LLC to Sorrento Enterprises, LLC – Series G; 8) Minooka Land Investment, LLP to Sorrento Enterprises, LLC – Series H; 9) Security National Warranty, LLC to Sorrento Enterprises, LLC – Series I; 10) Hazel Ravine Partners, LLC to Sorrento Enterprises, LLC – Series J; 11) Skokie Curragh, LLC to Sorrento Enterprises, LLC – Series K; 12) Kaufman & Udell Investments to Sorrento Enterprises, LLC – Series L; and 13) 2015 W. Irving, LLC to Sorrento Enterprises, LLC – Series N.

PNC's federal proceedings pending the conclusion of state court litigation. The Court denied the motion on September 21, 2016. *See* dkt. no. 34.

On November 30, 2016, defendants moved for summary judgment on PNC's original complaint, arguing that PNC's claims are time-barred. On January 5, 2017, PNC amended its complaint to add three additional counts. First, PNC sought a declaratory judgment that Sorrento Enterprises and its Series hold title to Glenn's assets as his nominee (Count 5). Second, PNC asserted an unjust enrichment claim against Pamela and Sorrento Enterprises and its Series (Count 6). Third, PNC asserted a successor liability claim, specifically a judgment holding Sorrento Enterprises and its Series liable for Glenn's debts (Count 7). Defendants have moved to dismiss the new claims.

## Discussion

### A.    Motion for summary judgment

Defendants seek summary judgment on counts one through four of PNC's amended complaint, arguing that PNC's claims challenging the asset transfers to Sorrento Enterprises and its Series and its claims of aiding and abetting a fraudulent transfer and conspiracy to defraud are time-barred. Defendants also argue that Illinois law prohibits PNC from levying on Glenn's wages or life insurance policies to satisfy PNC's judgment. Finally, defendants argue that PNC cannot bring a veil-piercing claim to reach the assets of Sorrento Enterprises and its Series because that would constitute a reverse veil-piercing claim, which is not recognized by Delaware law, under which the entities were formed.

PNC argues that its claims are timely and that even if they were filed outside the

limitations period, the claims survive based on the doctrines of equitable estoppel and equitable tolling. Finally, PNC contends that it is not asserting a reverse veil-piercing claim, but, if the claim is read that way, Delaware law permits such a claim.

Summary judgment is proper where the moving party "demonstrates that there is no genuine issue as to any material fact and [that it] is entitled to a judgment as a matter of law." *Tsareff v. ManWeb Servs., Inc.*, 794 F.3d 841, 844 (7th Cir. 2015). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, a court must "construe all facts and inferences in favor of the party against whom the motion under consideration was made." *Tsareff*, 794 F.3d at 844.

### 1.    Timeliness

PNC asserts that Glenn made fraudulent transfers to Sorrento Enterprises and its Series in violation of section 5 of the UFTA. Section 5 UFTA states:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.
> . . . .

740 ILCS 160/5(a).

The statute of limitations for PNC's UFTA claim is provided by section 10 of the

UFTA, which states:

> A cause of action with respect to a fraudulent transfer or obligation under
> this Act is extinguished unless action is brought:
>
> (a) under paragraph (1) of subsection (a) of Section 5, within 4 years after
> the transfer was made or the obligation was incurred or, if later, within one
> year after the transfer or obligation was or could reasonably have been
> discovered by the claimant;
>
> (b) under paragraph (2) of subsection (a) of Section 5 or subsection (a) of
> Section 6, within 4 years after the transfer was made or the obligation was
> incurred; or
>
> (c) under subsection (b) of Section 6, within one year after the transfer
> was made or the obligation was incurred.

740 ILCS 160/10.

In accordance with these statutes, a claim under section 5 of the UFTA must be

brought within four years "after the [fraudulent] transfer was made" or, "if later, within

one year after the transfer . . . was or could reasonably have been discovered by the

claimant." *Fid. Nat. Title Ins. Co. of New York v. Howard Sav. Bank*, 436 F.3d 836, 838

(7th Cir. 2006) (internal quotation marks omitted). The term "discovery" refers to the

point at which the plaintiff discovers that she has been wrongfully injured. *Id*. at 839.

From that point, the plaintiff has one year to discover who injured her and file suit. *Id*.

If, after the one-year limitations period, the plaintiff cannot discover who caused

her injury "despite the exercise of reasonable diligence," she "can appeal to the doctrine

of equitable tolling to postpone the deadline for suing until [s]he can obtain the

necessary information." *Id*. Additionally, where a person who is potentially liable

fraudulently conceals a claim—in this case, the transfer of assets to avoid a judgment—

section 13-215 of the Illinois Code of Civil Procedure operates to extend the limitations period.  *See* 735 ILCS 5/13-215.  Section 13-215 states:

> If a person liable to an action fraudulently conceals the cause of such action from the knowledge of the person entitled thereto, the action may be commenced at any time within 5 years after the person entitled to bring the same discovers that he or she has such cause of action, and not afterwards.

*Id.*  To obtain the benefit of section 13-215, a plaintiff must establish "that the defendant made misrepresentations or performed acts which were known to be false, with the intent to deceive the plaintiff, and upon which the plaintiff detrimentally relied."  *Jenkins v. State Farm Fire & Cas. Co.*, 2017 IL App (1st) 160612-U, ¶ 28 (internal quotation marks omitted); *see also, e.g.*, *Doe v. Boy Scouts of Am.*, 2016 IL App (1st) 152406, ¶ 80, 66 N.E.3d 433, 455 ("Fraudulent concealment is not a cause of action in and of itself[,] [r]ather, it is an exception to the limitations period imposed on other, underlying causes of action.") (internal citations omitted).  Section 13-215 is not available "where the claimant discovers the fraudulent concealment, or should have discovered it through ordinary diligence, and a reasonable time remains within the remaining limitations period."  *Jenkins*, 2017 IL App (1st) 160612-U, ¶ 28 (internal quotation marks omitted).  *See also In re Sandburg Mall Realty Mgmt. LLC*, 563 B.R. 875, 886-87 (Bankr. C.D. Ill. 2017) (citing *Morris v. Margulis*, 197 Ill. 2d 28, 37-38, 754 N.E.2d 314, 319-20 (2001)).

The parties dedicate a significant portion of their briefs to the issue of which event starts the clock under the UFTA's statute of limitations—the date of the fraudulent transfer (which in this case was before PNC got its judgment against Glenn) or the date the creditor obtains a judgment.  PNC cites to dicta in *GEA Grp. AG v. Flex-N-Gate Corp.*, 740 F.3d 411 (7th Cir. 2014), to support its contention that the UFTA's statute of

limitations is not triggered in a case like this one until the creditor obtains a judgment against the debtor. In *GEA*, the Seventh Circuit stated that "the idea that a claim for fraudulent conveyance aimed at evading having to pay a hypothetical future judgment accrues before the judgment is entered seems far-fetched." *Id.* at 417. Defendants, on the other hand, cite to Illinois appellate court decisions to support the proposition that the date of the fraudulent conveyance triggers UFTA's statute of limitations, even if that predates the creditor's obtaining of a judgment. *See, e.g., Levy v. Markal Sales Corp.*, 311 Ill. App. 3d 552, 556, 724 N.E.2d 1008, 1011 (2000) ("the clear and unambiguous wording of the [UFTA] demonstrates [that] the four-year limitation period begins to run on the date the challenged transfer was made"); *see also, Salisbury v. Majesky*, 352 Ill. App. 3d 1188, 1191, 817 N.E.2d 1219, 1222 (2004).

There is a good deal of logic in the Seventh Circuit's approach, but the Court need not resolve this issue at this stage of the litigation. Assuming defendants are correct that the date of the allegedly fraudulent transfer is the triggering event for the UFTA's four-year statute of limitations, defendants are entitled to summary judgment only if they demonstrate that no reasonable fact finder could find PNC filed this suit within a year after it discovered that Glenn made the asset transfers *and* they defeat application of the fraudulent concealment rule in section 13-215.

Defendants contend that PNC was put on notice of Glenn's asset transfers in April 2011, when PNC received his financial statement and related disclosures. PNC did not file suit until May 16, 2016, over five years later. PNC, for its part, contends that it first became aware of the alleged fraudulent transfers on September 15, 2015 when, in response to a citation to discover assets, Glenn disclosed that he transferred his

assets to the Sorrento Series entities.  PNC filed suit about eight months after that.

A reasonable fact finder could find that Glenn's April 2011 disclosures did not contain enough information to put PNC on notice regarding the asset transfers at issue in this case.  Though the disclosures contain several references to "Sorrento Enterprises, LLC," that is not the same as the Sorrento Series entities, which actually hold the assets in dispute.  And the disclosure also makes no mention that Glenn was funneling his law firm salary into a Sorrento entity.  Indeed, the 2009 tax return that Glenn provided to PNC suggested otherwise; it reflects Glenn's $350,000 from his law firm.[3]  Moreover, the disclosures do not appear to fully disclose Glenn's five whole life insurance policies with face amounts of, respectively, $200,000, $100,000, $100,000, $500,000, and $500,000.  Instead, Glenn's PFS identified a single whole life insurance policy with a face value of $900,000, as well as a number of term policies.  In addition, the April 2011 disclosures omitted any mention of the Galena Property or its transfer to Sorrento Enterprises, LLC – Series O.  And a reasonable fact finder could determine that the disclosure did not clue PNC into the transfer of Glenn's interests in the Udell Entities to Sorrento Enterprises, LLC – Series A through L and N or the transfer of Glenn and Pamela's personal property to another Sorrento Enterprises Series entity.

Defendants concede that the April 2011 disclosures did not expressly report the information just discussed, but they contend that the disclosures contained enough to put PNC on notice that some assets were held not directly but rather through an entity,

---

[3] The Court does not suggest by this that the tax return was inaccurate; presumably the income was properly reportable by the Udells even though Glenn had redirected it to a Sorrento entity.  The Court's point is that the disclosures suggested that the income was going to Glenn in his own name and thus was available to pay down his debts; it did not put the bank on notice of the diversion of the salary to a Sorrento Series entity.

thus requiring PNC to investigate further. They note that the discovery rule in the UFTA limitations period and the tolling provision of section 13-215 do not apply where a plaintiff fails to exercise reasonable diligence, and they argue that reasonable diligence is lacking here. Defendants note that Glenn's PFS reported that "[a]ll interests in the assets listed in [the PFS] are owned by Glenn L. Udell as a co-member in Sorrento Enterprises, LLC," dkt. no. 15 at 6, and it listed that same entity the owner of the three term and one whole life insurance policies reported in the PFS. Defendants also note that the 2009 tax return reported transfers of some sort to Sorrento Enterprises that year (albeit interests that suffered losses).

The Court concludes, however, that a reasonable finder of fact could determine that PNC acted with reasonable diligence. A reasonable finding could be made that the April 2011 disclosures had omissions (discussed above) and half-truths that would have thrown a reasonably diligent investigator off the trail—or led it not to inquire at all—rather than the opposite. Specifically, a fact finder could make a reasonable finding that PNC would have no reason to suspect from the April 2011 disclosures that Udell had transferred significant assets, including his salary and the Galena Property, to eighteen separate entities in the Sorrento Series. Nothing in the disclosures suggested the existence of any entity holding Glenn's assets other than "Sorrento Enterprises, LLC."

For these reasons, defendants are not entitled to summary judgment on their statute of limitations defense.

### 2. Aiding and abetting a fraudulent transfer and civil conspiracy

The parties appear to agree that PNC's claims of aiding and abetting a fraudulent transfer and civil conspiracy to defraud are not independent claims but rather depend on

PNC's fraudulent transfer claims. Under Illinois law, a claim of aiding and abetting a fraud or conspiracy to defraud cannot exist without a viable underlying fraud claim. *See Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006) ("[A]iding and abetting is a theory for holding the person who aids and abets liable for the tort itself[.]"); *Mauvais-Jarvis v. Wong*, 2013 IL App (1st) 120070, ¶ 109, 987 N.E.2d 864, 894 ("It is well-settled that conspiracy, standing alone, is not a separate and distinct tort in Illinois."). The current dispute involves is whether these claims are timely. The same genuine factual disputes that preclude entry of summary judgment on the timeliness of PNC's fraudulent transfer claims also preclude summary judgment on the aiding and abetting and conspiracy claims.

### 3. Life insurance

In a single sentence in a small-type footnote, defendants contend that Illinois law prohibits creditors from reaching a debtor's life insurance policies to satisfy a judgment. The Court overrules this argument for purposes of summary judgment because it is insufficiently developed.

### 4. Wages

Defendants also argue that Glenn's wages are exempt from collection. They contend that PNC may levy on Glenn's salary only through a wage deduction order under the Illinois Wage Deduction Act (IWDA). They argue that transferring his salary to an account belonging to a Sorrento Enterprises entity cannot be considered a fraudulent conveyance, because a "creditor could always avail itself of the statutory mechanism to collect any nonexempt wages directly from the employer." Defs.' Mem. in Supp. of Mot. for Summ. J. at 19. Defendants also argue that the UFTA prohibits the

fraudulent transfer of "assets," *see* 735 ILCS 160/2(b)(2); the term "asset" under the statute does not include "property to the extent it is generally exempt under laws of this State," *id.*; and the IWDA exempts all but fifteen percent of a debtor's gross pay. *See* 735 ILCS 5/12-803.

This argument is insufficiently developed to warrant extended treatment. In the section of their opening brief dedicated to this issue, defendants cite to sections of the UFTA and the IWDA but say nothing else. One problem with the argument is that PNC contends that the transfer of Glenn's salary to the Sorrento entity was concealed from the bank for an extended period. The language of statutes that defendants cite do not support the proposition that a debtor's diversion of his salary to another entity before a creditor is even aware of it cannot be considered a fraudulent transfer. Nor does the statutes' language indicate that money or other property that came from wages is exempt from levy regardless of when the wages were earned. If that were true, a debtor's savings derived from his wages could never be reached to satisfy a judgment, which would make no sense. In fact, the law is clear that that the IWDA applies to wages yet to be paid, not past wages. *See, e.g.*, *In re Jokiel*, No. BR 09-B-27495, 2012 WL 33246, at *3 (Bankr. N.D. Ill. Jan. 5, 2012) ("[O]nce the wages are received or deposited in a bank account, the wages would no longer be protected. Once the funds are in the hands of the debtor, creditors can collect on them through a citation proceeding or other form of process."); *In re Mayer*, 388 B.R. 869, 874 (Bankr. N.D. Ill. 2008) ("The 15% collection limitation of § 12–803 therefore imposes an exemption as to 85% of a debtor's *unpaid wages*, applicable under the Bankruptcy Code.") (emphasis added); *see, also*, *In re Meier*, 528 B.R. 162, 165 (Bankr. N.D. Ill. 2015) ("[The IWDA]

creates an exemption for unpaid wages.").  Defendants have shown no basis for entry of summary judgment on the part of PNC's claims based on Glenn's diversion of his wages to a Sorrento entity.

### 5.    Reverse veil piercing

Defendants argue that it is entitled to summary judgment on Count 2, PNC's veil-piercing claim (on which Sorrento and its Series are the named defendants).  Defendants contend that this is a reverse veil-piercing claim that is not recognized by Delaware law.

Delaware law governs Count 2; the law of the state under whose law the entity was formed governs veil-piercing claims.  *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 378 (7th Cir. 2008).  "[U]nder Delaware law, the doctrine of piercing the corporate veil applies to a limited liability company."  *Westmeyer v. Flynn*, 382 Ill. App. 3d 952, 960, 889 N.E.2d 671, 678 (2008); *see, e.g., Green Skyline Solar, LLC v. Sunpin Solar Dev., LLC*, No. 16 C 7659, 2017 WL 661593, at *3 (N.D. Ill. Feb. 16, 2017) ("[F]ederal courts have recognized that corporate veil piercing is applicable to limited-liability companies.").  It is undisputed that Sorrento Enterprises and its Series were formed in Delaware and that Delaware law applies here.

Despite PNC's contentions otherwise, it is asserting a reverse-veil piercing claim.  A traditional veil-piercing claim aims at holding an entity's owners liable for the entity's debts.  *See In re Glick*, 568 B.R. 634, 659 (Bankr. N.D. Ill. 2017) (discussing Delaware law).  A reverse veil-piercing claim, on the other hand, aims at holding the entity liable for the owner's debts.  *Id.*  The same is true for limited liability corporations and its members.  In Count 2, PNC seeks to impose liability on Sorrento Enterprises and its

Series based on the asset transfers by Glenn.  This is a reverse veil-piercing claim.

Delaware law has not recognized reverse veil-piercing as a legitimate cause of action.  *See id.* at 661.  PNC does not dispute this.  Rather, PNC states that "[w]hile it appears that no Delaware courts have defin[itive]ly held whether Delaware recognizes reverse veil piercing, at least one recent opinion from the Court of Chancery of Delaware suggests that it would."  Pl.'s Resp. to Defs.' Mot. to Dismiss at 21.  However, it is not the role of this Court in a diversity case like this one to expand the state law of another jurisdiction.  *See Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 1004 (7th Cir. 2006).

Defendants are entitled to summary judgment on count 2 of PNC's amended complaint.

## B.    Motion to dismiss

Defendants have moved to dismiss counts 5, 6, and 7 of PNC's amended complaint.  To briefly summarize, in count 5, PNC asserts that Sorrento Enterprises and its Series are liable for Glenn's debts because they are holding his assets as his nominee.  In count 6, PNC asserts that, by transferring their assets to Sorrento Enterprises and its Series, Glenn and Pamela were unjustly enriched.  In count 7, PNC contends that Sorrento Enterprises and its Series are liable for Glenn's debts under a theory of successor liability.

A Rule 12(b)(6) motion to dismiss "challenges the sufficiency of [a] complaint to state a claim upon which relief may be granted."  *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009).  When reviewing a motion to dismiss, a court must "accept as true all the plaintiff's well-pleaded factual allegations

and the inferences reasonably drawn from them." *Gibson v. City of Chicago*, 910 F.2d

1510, 1520-21 (7th Cir. 1990) (internal quotation marks omitted). In order for a

complaint to survive a motion to dismiss, it "must contain sufficient factual matter [] to

state a claim to relief that is plausible on its face." *Reynolds v. CB Sports Bar, Inc.*, 623

F.3d 1143, 1146 (7th Cir. 2010) (internal quotation marks omitted). A claim is plausible

on its face where the plaintiff "pleads factual content that allows [a] court to draw [a]

reasonable inference that the defendant is liable for the misconduct alleged." *Bausch v.*

*Stryker Corp.*, 630 F.3d 546, 558 (7th Cir. 2010) (internal quotation marks omitted).

### 1. Count 5

In Count 5, PNC alleges that Glenn "engaged in a legal fiction" by transferring his

assets to Sorrento Enterprises and its Series "while retaining all benefits of ownership"

of those assets; it seeks a finding that "Sorrento and its Series hold title to the Galena

Property, Udell Entities, NY Life Insurance Policies, and [Glenn's] income and cash as a

nominee for [Glenn]." Am. Compl. ¶¶ 86-87. Defendants seeks dismissal of this claim.

They argue this sort of determination may be made only as a part of the supplementary

post-judgment proceedings in state court.

The Court overrules defendants' contention. As noted earlier, the Court

previously denied defendants' request to dismiss or stay the entire case in favor of the

allegedly parallel state court proceedings. The current request for dismissal of Count 5

amounts to a repackaging of this same point. The Court ultimately may conclude that it

is inappropriate to enter a declaratory judgment, which is a discretionary remedy, *see,*

*e.g., Wilton v. Seven Falls Co.*, 515 U.S. 277, 282-83 (1995), but the Court will not at

this point preclude PNC from even attempting to pursue the claim in federal court. *See*

*generally R.R. St. & Co. v. Vulcan Materials Co.*, 569 F.3d 711, 714 (7th Cir. 2009) (Court possesses "considerable leeway in deciding whether to entertain [a] declaratory judgment action[ ].").

In any event, this claim does not duplicate any claim in the state court proceedings. In state court, PNC issued a citation to discover assets to Sorrento Enterprises, not Sorrento Enterprises Series A through R. Count 5, by contrast, is aimed at assets held by Sorrento Enterprises Series A through R, not Sorrento Enterprises.

For these reasons, the Court declines to dismiss count 5.

### 2.     Count 6

In Count 6, PNC asserts an unjust enrichment claim. It alleges that "Sorrento and its Series' retention, and Pamela's retention as a co-owner of Sorrento and its Series, of [Glenn's] assets while PNC's Judgment remains outstanding violates the fundamental principles of justice, equity, and good conscience." Am. Compl. ¶ 89. Defendants seeks to dismiss this claim, arguing that PNC has not alleged facts sufficient to sustain a claim for unjust enrichment.

To state a claim for unjust enrichment where a plaintiff "is seeking recovery of a benefit that was transferred to the defendant by a third party," the plaintiff must show that "(1) the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead, (2) the defendant procured the benefit from the third party through some type of wrongful conduct, or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant." *HPI Health Care Servs., Inc. v.*

*Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 161-62, 545 N.E.2d 672, 679 (1989) (internal citations omitted).

Defendants contends that PNC's unjust enrichment claim fails under each of these standards. First, defendants argue, and PNC does not dispute, that PNC has not alleged facts sufficient to sustain a claim that Pamela and Sorrento Enterprises and its Series were mistakenly given a benefit. Second, defendants argue that PNC has not alleged facts tending to show that Pamela and Sorrento Enterprises and its Series received a benefit as a result of wrongful conduct or that PNC had a superior claim to the benefit conferred upon Pamela and Sorrento Enterprises and its Series. Defendants note that many of PNC's factual allegations concern Glenn's transfers of assets in 2008 and 2009 to Sorrento Enterprises and its Series. Defendants argue that this cannot provide the basis for a claim for unjust enrichment because, at the time of the transfers, Glenn did not have a present obligation to pay PNC. PNC alleges that Glenn guaranteed a loan for $4,185,000 in 2007 for the purchase of real estate and that, when the real estate market took a downturn in 2008, he formed Sorrento Enterprises and its Series and transferred his and Pamela's assets to those entities to keep them out of the reach of creditors. This is an adequate allegation that the defendants named in Count 6 received a benefit by shielding their assets from PNC.

### 3.     Count 7

PNC asserts that, "[a]s a result of [Glenn's] deliberate efforts to attempt to place his assets outside of the reach of his creditors, including PNC, and thereby escape his liabilities, Sorrento and its Series, which received [Glenn's] assets, is G. Udell's successor and therefore is liable for [Glenn's] liabilities." Am. Compl. ¶ 91. Defendants

seek to dismiss this claim, arguing that PNC fails to state a claim for successor liability.

The doctrine of successor liability provides an exception to the general rule that "a corporation that purchases the assets of another corporation is not liable for the debts or liabilities of the transferor corporation." *Vernon v. Schuster*, 179 Ill. 2d 338, 344-45, 688 N.E.2d 1172, 1175 (1997). A court may impose successor liability on a corporation or a sole proprietor "(1) where there is an express or implied agreement of assumption; (2) where the transaction amounts to a consolidation or merger of the purchaser or seller corporation; (3) where the purchaser is merely a continuation of the seller; or (4) where the transaction is for the fraudulent purpose of escaping liability for the seller's obligations." *Id.* at 345, 688 N.E.2d at 1176. For example, "[w]here a sole proprietor transfers all his assets to a corporation in exchange for a majority share in the corporation, that corporation may have assumed the liabilities of the proprietorship." *GMAC, LLC v. Hillquist*, 652 F. Supp. 2d 908, 918 (N.D. Ill. 2009) (citing *Plaza Exp. Co. v. Middle States Motor Freight, Inc.*, 40 Ill. App. 2d 117, 121, 189 N.E.2d 382, 384 (1963)).

PNC has alleged facts sufficient to state a claim for successor liability. It adequately alleges that Glenn was a sole proprietor in the real estate business at the time he allegedly transferred his assets to Sorrento Enterprises and its Series. Defendants argue that Glenn's business was and is the practice of law and that the fact that he made personal real estate investments does not make him a sole proprietor in that business. But there is no rule that a person can engage in only one business. And PNC does not simply allege that Glenn had personal investments. It contends that Glenn invested heavily in the real estate market and that by acting as a guarantor of the

loans for these entities, he was effectively conducting a real estate investment business.[4]  The record is sufficient to permit such an inference.  One example involves Glenn's relationship with 9362 Joint Venture, LLC.  That entity obtained a loan from PNC for $4,185,000 to purchase real estate; GLU, LLC was a manager of 9362 Joint Venture, LLC; and Glenn was a manager of GLU, LLC.  One can reasonably infer from these facts that, by personally guarantying 9362 Joint Venture, LLC's loan, Glenn was facilitating a business transaction rather than simply making a personal investment.

PNC alleges that shortly after making the guaranties cited earlier, and after at least one of the entities defaulted, Glenn formed Sorrento Enterprises and its Series and transferred all or nearly all of his assets to those entities for no or inadequate consideration, to shield the assets from creditors.  It is plausible to infer that Sorrento Enterprises and its Series amount to a continuation of Glenn's sole proprietorship.  They appear to consist of only of Glenn's former assets, and Glenn and Pamela are the entities' sole owners.  The Court therefore declines to dismiss count 7 of PNC's amended complaint.

### Conclusion

For the foregoing reasons, the Court denies defendants' motion for summary judgment [dkt. no. # 43] on counts 1, 3, and 4 of plaintiff's amended complaint.  The Court grants summary judgment in defendants' favor on count 2 of plaintiff's amended complaint.  Finally, the Court denies defendants' motion to dismiss [dkt. no. # 70].

---

[4] Specifically, PNC alleges that Glenn "had undertaken guaranties of $4,185,000 in favor of PNC; $6,525,000 in favor of MB Financial; $175,000 in favor of MB Financial; $6,150,000 in favor of Bridgeview Bank; $572,000 in favor of Bridgeview Bank; and $2,650,000 in favor of Bridgeview Bank."  Pl.'s Resp. to Defs.' Mot. to Dismiss at 10.

Defendants are to answer the remaining claims by no later than August 25, 2017.  The case remains set for a status hearing on August 21, 2017 at 9:30 a.m.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  August 13, 2017